UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| SEAN DEMPSEY,<br><br>Plaintiff,<br><br>v.<br><br>QUALITY CORRECTIONAL CARE,<br>JOHN REYNOLDS,<br><br>Defendants. | ) | No. 2:24-cv-00525-JPH-DML |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Sean Dempsey initiated this civil rights action while he was detained at Vigo County Security Center ("the Jail"). Dkt. 1. Mr. Dempsey is proceeding on Fourteenth Amendment claims against Quality Correctional Care ("QCC") and Nurse Practitioner John Reynolds based on allegations that they denied healthcare after Mr. Dempsey suffered from multiple severe allergic reactions to food at the Jail from May 2024 until October 2024. *See* dkt. 8. The Defendants move for summary judgment. For the reasons explained below, the Defendants' motion, dkt. [57], is **GRANTED**.

## I.
## Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to

the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Mr. Dempsey and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572–73. All facts are undisputed unless noted.

**A. The Parties**

Mr. Dempsey was booked into the Jail on May 7, 2024 and then released on May 13. Dkt. 58-3 at 1. (Booking Information). He returned to the Jail on May 21, 2024 until July 18, 2024. *Id.* at 2. On July 24, 2024, Mr. Dempsey was booked into the Jail again. *Id.* at 3; *see* dkt. 70.

QCC is the third-party medical services provider for detainees at the Jail. Dkt. 58-2 ¶ 1 (Reynolds Aff.). QCC provides medical services to the Jail according to the Healthcare Services Agreement ("the Agreement"). *Id.* ¶ 2. The Agreement's policies are modeled after the National Commission on Correctional Healthcare. *Id.* ¶ 3. NP Reynolds is a licensed nurse practitioner employed by QCC and, during the relevant time, provided medical services to detainees at the Jail as part of his rotation. *Id.* ¶ 5.

**B. Mr. Dempsey's Medical History at the Jail Before May 2024**

Before Mr. Dempsey's most recent incarceration in May 2024, he was evaluated by QCC medical staff at the Jail from 2021 until 2023 for allergic reactions to food, rashes, diabetes, and low blood sugar. *See* dkt. 58-1 at 13–22 (Dempsey QCC Medical Records).[1] Nurses routinely found that Mr. Dempsey did not have low blood sugar. *Id.* Mr. Dempsey consistently had rashes, which he at one point attributed to "something he ate" as well as the Jail's blanket and clothes. *Id.* at 13. Other times, he attributed rashes to something in the Jail, such as new linens, the sprinkler opening in his cell, Jail water, soap, and blankets, since he reported that he only got the rashes in Jail. *Id.* at 14–15, 20,

[1] The Court cites to the page numbers in the pdf file.

22. QCC staff prescribed Benadryl, Claritin, topical cream, and/or Prednisone. *Id.* NP Reynolds did not treat Mr. Dempsey during this time. Dkt. 58-2 ¶ 9 (Reynolds Aff.).

**C. Mr. Dempsey's Medical Treatment from May 2024 until October 2024**

During Mr. Dempsey's book-in on May 7, 2024, the nurse determined that Mr. Dempsey's vital signs were normal and that he was calm and cooperative. He did not report any concerns related to medication or food allergies. Dkt. 58-1 at 2–3, 95.

On May 10, Mr. Dempsey initially refused his medical intake assessment. Later that day, a nurse assessed him after he complained about chest and arm pain. *Id.* at 2–4. The nurse determined that Mr. Dempsey's vital signs were normal, and a nurse practitioner prescribed Nitroglycerin, which is a standard treatment for chest pain, as well as Benadryl for anxiety. *Id.* at 26, 88; dkt. 58-2 ¶ 17. On May 11 and May 12, Mr. Dempsey received medical care from medical staff related to arm and chest pain, suicidal ideation, withdrawal, and hearing voices. Dkt. 58-1 at 4–5, 26–27; 100–04. Mr. Dempsey was released from the Jail on May 13. Dkt. 58-3 at 1.

After Mr. Dempsey returned to the Jail on May 21, he was evaluated by a nurse for wrist pain. Dkt. 58-1 at 22. On May 27, Mr. Dempsey reported to medical staff that he "cannot have anything with salt, meat, peanut butter, or bread" because he breaks out in hives, and that the last time he was in the Jail, they determined he had food allergies. *Id.* at 53–54. Medical staff ordered an EpiPen 2-pack in case Mr. Dempsey had allergic reactions. *Id.* at 89.

On May 29, a nurse evaluated Mr. Dempsey after he complained about hives and throat swelling. *Id.* at 4. The nurse administered an EpiPen in Mr. Dempsey's leg. *Id.* The medical provider ordered Mr. Dempsey to keep a paper log of his food outside his cell and to not order commissary for 14 days. *Id.*

Mr. Dempsey complained about rashes and allergic reactions on June 1, June 7, June 9, and June 12. *Id.* at 4–9, 23. Medical providers assessed Mr. Dempsey's rash, determined that he did not have closed airways, determined that his vitals were normal, and advised him to continue taking the Benadryl and other medications. *Id.* On June 10, medical provider Dr. Kevin Dew, who is not a party in this action, noted that Mr. Dempsey "apparently has severe food allergies" but "has no idea what he is allergic to." *Id.* at 27. Dr. Dew noted that in addition to the prescribed Benadryl, he will have Mr. Dempsey speak with the nurse about what he can eat and will "do RAST," which is a test for dietary allergies. *Id.*; *id.* at 61.

On June 29, a nurse administered an EpiPen in Mr. Dempsey's leg after he complained about a rash and his throat being swollen. *Id.* at 9. The nurse sent an update to a nurse practitioner, who advised to keep Mr. Dempsey's usual orders for Benadryl and Prednisone and deferred to Dr. Dew for a follow-up. *Id.* Mr. Dempsey was prescribed hydrocortisone cream the following day. *Id.* at 10.

On July 3, Dr. Dew noted that a nurse reported that Mr. Dempsey admitted to fabricating an allergic reaction in order to receive Benadryl. *Id.* at 24. A few days later, kitchen staff at the Jail informed Dr. Dew that Mr. Dempsey requested a high protein and gluten-free diet. Dr. Dew noted that there is nothing

documented indicating that Mr. Dempsey should receive a special diet. *Id.* On July 8, a medical provider noted that she informed the kitchen that the only special diet Mr. Dempsey receives is low sodium. *Id.* She also noted that kitchen staff reported that Mr. Dempsey had pulled out his hair and put it in the food trays to receive a sack lunch. *Id.*

Mr. Dempsey was released from the Jail on July 18. Dkt. 58-3 at 3. A few days after returning to the Jail on July 24, Mr. Dempsey reported an allergic reaction. Dkt. 58-1 at 11. Nurses noted that Mr. Dempsey's vital signs and oxygen levels were normal, his throat was not swollen or closed, and he was able to walk around without difficulty. *Id.* The nurse referred Mr. Dempsey for a sick call to examine his rash. *Id.* at 12.

On August 8, Mr. Dempsey complained about "vomiting and diarrhea after eating the processed meats in the jail," and he wanted to know if he could substitute the meat on his tray. *Id.* at 61–63. The nurse noted that Mr. Dempsey's vital signs were normal. *Id.* at 61. NP Reynolds did not order any treatment. *Id.* at 63. On August 11, Mr. Dempsey complained about a rash and increased anxiety. *Id.* at 64–65. A medical provider ordered hydrocortisone cream and a follow-up with mental health if symptoms worsened. *Id.*

On September 9, a nurse evaluated Mr. Dempsey for complaints of high fever, flu-like symptoms, and kidney pain. *Id.* at 65–66. The nurse determined that Mr. Dempsey's vital signs and lab results were normal and prescribed Tylenol and recommended that he increase fluids. *Id.* at 66–67.

On September 22, a medical provider prescribed hydrocortisone cream after Mr. Dempsey complained about irritated red skin. *Id.* at 68–69. On September 26, a QCC nurse evaluated the same rash that Mr. Dempsey complained about on September 22. She noted that she did not observe any redness or other symptoms. *Id.* at 70–72. After reviewing the picture of the rash and Mr. Dempsey's medical history, NP Reynolds determined that the previously-prescribed hydrocortisone cream was sufficient. *Id.* at 70–71; dkt. 58-2 ¶ 61.

On October 2, NP Reynolds examined Mr. Dempsey after he claimed that the Jail's food was causing allergic reactions. Dkt. 58-2 ¶ 62. NP Reynolds's notes state that, although Mr. Dempsey claimed the food was causing allergic reactions, he did not see a visible rash or reaction on the examination. Dkt. 58-1 at 27. Therefore, NP Reynolds noted "[n]othing to substantiate a special diet." *Id.*

On October 20, a medical provider evaluated Mr. Dempsey after he complained about hives due to celiac disease. *Id.* at 72. Mr. Dempsey noted that his symptoms had subsided after taking Benadryl. *Id.* Mr. Dempsey claimed that he had been given five EpiPen shots. *Id.* Mr. Dempsey requested a low carbohydrate, high protein diet, which he claimed he was on during his previous stays at the Jail. *Id.* at 74. The medical provider noted that there were no hives in the picture and that Mr. Dempsey's vital signs were stable. *Id.* at 74. She stated "no new orders. [N]o diet change at this time. [W]ill leave that up to onsite provider." *Id.*

On October 24, a QCC nurse administered an EpiPen in Mr. Dempsey's leg after he complained about hives and finding it hard to swallow after eating food. *Id.* at 24, 93. NP Reynolds, who was not involved in Mr. Dempsey's treatment that day, noted that Mr. Dempsey's vital signs and oxygen saturation levels were within the normal range. *Id.*; dkt. 58-2 ¶¶ 66–67.

On October 27, NP Reynolds refilled Mr. Dempsey's prescriptions for Budesonide and Methotrexate, which are used to treat inflammatory conditions as well as psoriasis. Dkt. 58-1 at 93; dkt. 58-2 ¶ 70. He also refilled a prescription for folic acid, which helps the body make new cells. Dkt. 58-2 ¶ 70.

The three times in the designated evidence that he treated Mr. Dempsey, NP Reynolds did not believe that it was necessary to send him to the emergency room since his vital signs and oxygen saturation levels were normal. *Id.* ¶¶ 74–77.

NP Reynolds declined to change Mr. Dempsey's diet because, despite having eaten the Jail's regular food since 2021, Mr. Dempsey was not treated with an EpiPen before May 2024. *Id.* ¶ 78. NP Reynolds reasoned that if Mr. Dempsey had celiac disease or severe allergies, he would be having allergic reactions and/or celiac symptoms daily. *Id.* Furthermore, since celiac disease is a lifelong chronic illness, NP Reynolds noted that Mr. Dempsey never reported that he had been previously diagnosed and treated for it. *Id.* NP Reynolds also noted that Mr. Dempsey never completed the assigned food diary. *Id.* Indeed, Mr. Dempsey's medical records revealed that he had changed what he believed to be causing his allergic reactions (e.g., wearing Jail clothes, water, linens, etc.). *Id.*

At times, he stated that he needed an all-bean diet and at other times he stated he needed a high protein, low carbohydrate diet. *Id.* Last, NP Reynolds noted that Mr. Dempsey's reports about his health conditions were frequently not consistent with the medical providers' objective assessments. *Id.* ¶¶ 78–79.

**D. QCC's Policies**

QCC's agreement with the Jail states that it will provide healthcare services to the Jail, including preventative and therapeutic care. Dkt. 66 at 7. QCC has a nursing protocol governing treatment of anaphylactic reaction. *Id.* at 4. The medical provider should (1) assess subjective symptoms, such as itching, difficulty breathing, swelling, redness of skin, choking, and confusion, (2) inquire about when the symptoms started and what caused them; and (3) review previous history. *Id.* Then, the provider should review objective symptoms, such as vital signs, documentation of diaphoresis, rash, edema, swollen tongue or throat, wheezing, and rapid pulse. The provider then must choose whether to call 911 and/or perform any on-site interventions such as establishing an airway, administering an EpiPen, and establishing breathing and circulation. *Id.*

## III.
## Discussion

The parties agree that Mr. Dempsey was a pretrial detainee during the events in this lawsuit. Therefore, the Fourteenth Amendment's Due Process Clause governs Mr. Dempsey's unconstitutional medical care claim. *Kingsley v. Hendrickson*, 576 U.S. 389 (2015); *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018). This claim requires the plaintiff to show that the defendants

displayed objective unreasonableness under the circumstances. *James v. Hale*, 959 F.3d 307, 318 (7th Cir. 2020). A plaintiff meets his burden by providing evidence that:

> (1) there was an objectively serious medical need; (2) the defendant committed a volitional act concerning the [plaintiff's] medical need; (3) that act was objectively unreasonable under the circumstances in terms of responding to the [plaintiff's] medical need; and (4) the defendant act[ed] "purposefully, knowingly, or perhaps even recklessly" with respect to the risk of harm.

*Gonzalez v. McHenry County, Ill.*, 40 F.4th 824, 828 (7th Cir. 2022) (quoting *Miranda*, 900 F.3d at 353−54). "This standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019) (cleaned up); *see also Pittman by and through Hamilton v. Madison Cnty., Ill.*, 108 F.4th 561, 570–72 (7th Cir. 2024).

To prevail on a Fourteenth Amendment claim against a medical provider, a plaintiff can show that the medical treatment "was such a significant 'departure from professional standards or practices' that it was objectively unreasonable." *Williams v. Patton*, 761 F. App'x 593, 597 (7th Cir. 2019) (unpublished) (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Mere disagreement with a medical provider's professional judgment does not establish that the provider's medical treatment was objectively unreasonable. *See Williams*, 937 F.3d at 944

(holding that a detainee's disagreement with a course of treatment "does not mean the course of treatment was objectively unreasonable").

"To recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right." *Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023).

**A. NP Reynolds**

At summary judgment, NP Reynolds does not contest that Mr. Dempsey had an objectively serious medical condition. Instead, he argues that there is no evidence that any of his treatment decisions were objectively unreasonable since he used his medical judgment to determine that Mr. Dempsey did not require emergency care or a change in diet during the three times that he treated him. Dkt. 61 at 21–23. Mr. Dempsey responds that NP Reynolds's decisions were unreasonable because he failed to follow QCC policy and send him to the emergency room, failed to consider that he required serious interventions such as EpiPens and Methotrexate, wrongly considered Mr. Dempsey's pre-2024 medical history, and failed to complete the RAST test for allergies or change his diet. Dkt. 65 at 6–9.

At the outset, Mr. Dempsey has not shown that NP Reynolds did not follow QCC's nursing protocol. The protocol that Mr. Dempsey relies on is about treating anaphylactic reaction, but there is no designated evidence NP Reynolds treated Mr. Dempsey for anaphylactic reactions. NP Reynolds instead treated him for complaints about rashes and his diet on August 8, September 26, and October 3.

For those three times, Mr. Dempsey has not designated evidence from which a jury could find that NP Reynolds acted unreasonably. During the first encounter on August 8, 2024, NP Reynolds did not order any additional treatment or change Mr. Dempsey's diet after Mr. Dempsey complained about "vomiting and diarrhea after eating the processed meats in the jail." Dkt. 58-1 at 61–63. Mr. Dempsey may not have agreed with this decision, but NP Reynolds based his decision on undisputed facts in the record that reflect his medical judgment. *See Williams*, 937 F.3d at 944. Specifically, Mr. Dempsey's vital signs were normal and his medical record revealed that he had a years-long history of complaining about allergic reactions to different Jail foods and conditions. While Mr. Dempsey argues that NP Reynolds's review of his pre-2024 medical record was irrelevant, he has not designated evidence that reviewing a patient's medical history when making a treatment decision departs from professional norms. *See id.* (declining to provide an inmate's desired medication "does not mean that the course of treatment was objectively unreasonable" when staff deny a request after "medical examination").

Mr. Dempsey also argues that NP Reynolds should have followed up with the RAST test ordered by Dr. Dew in June as well as considered the fact that he needed EpiPens in May and June. There is no designated evidence, however, that Dr. Dew ordered NP Reynolds to conduct a RAST test or that NP Reynolds was otherwise responsible for doing so. *See Whitfield*, 76 F.4th at 706 ("To recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right."). Instead, Dr.

Dew, who is not a defendant in this matter, noted "will do RAST" on June 10 but did not follow up. *See* dkt. 58-1 at 27.

Regarding the EpiPens, NP Reynolds testified that he did not believe that Mr. Dempsey had food-related allergies because he only required treatment with an EpiPen in May 2024, despite the fact that he had been extensively exposed to regular food at the Jail since at least 2021. *See* dkt. 58-2 ¶ 78. Mr. Dempsey's affidavit states in a conclusory manner that EpiPen injections are bad for the heart, but does not designate evidence supporting this assertion. Dkt. 68 at 6 ¶ 8. Without evidence that NP Reynolds's decision significantly departed from professional norms under the circumstances, no reasonable jury could find that NP Reynolds provided Mr. Dempsey with constitutionally inadequate healthcare.

For the same reasons, no reasonable jury could find NP Reynolds liable based on his September 26 and October 3 treatment decisions. On September 26, NP Reynolds reviewed a photograph of Mr. Dempsey's rash and did not observe any redness or other symptoms. Therefore, he reasoned that the hydrocortisone prescribed on September 22 for the same rash was sufficient. Mr. Dempsey has not designated evidence that this decision made his rash worse or prolonged any pain.

Similarly, on October 3, NP Reynolds examined Mr. Dempsey's rash and determined that he did not see a visible rash or reaction. Dkt. 58-1 at 27. He further noted that there was "[n]othing to substantiate a special diet." *Id.* Although Mr. Dempsey disagreed with this decision, there is no designated evidence that NP Reynolds acted unreasonably or against professional norms.

After all, Dr. Dew had noted in July that Mr. Dempsey's diet did not need to be changed. *Id.* 23–24. Later in October, after NP Reynolds's assessment, a different medical provider also noted that his diet did not need to be changed. *Id.* at 74. This designated evidence does not allow a reasonable jury to find that NP Reynolds's decision was unreasonable given the circumstances. *See Williams*, 937 F.3d at 943–44 (affirming summary judgment when medical providers exercised their medical judgment to conclude "that Williams was likely trying to take advantage of the medical system to garner special privileges").

Because no reasonable jury could find that NP Reynolds's treatment decisions were objectively unreasonable, NP Reynolds is entitled to summary judgment. *See James*, 959 F.3d at 318.

**B. QCC**

Private companies acting under color of state law, such as QCC, are treated as municipalities for purposes of § 1983 and can be sued when their actions violate the Constitution. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). "Liability under *Monell* is difficult to establish, requiring a § 1983 plaintiff to prove that a municipality, either through an express policy or an implied policy of inaction, took deliberate action that was the moving force behind a constitutional injury." *Taylor v. Hughes*, 26 F.4th 419, 435 (7th Cir. 2022). Liability may attach in two circumstances: First, "if an express municipal policy or affirmative municipal action is itself unconstitutional, . . . a plaintiff has a straightforward path to holding the municipality accountable . . . [and] a single

instance of a constitutional violation caused by the policy suffices to establish municipal liability." *Id.* Second, a plaintiff may show "gaps in express policies or . . . widespread practices that are not tethered to a particular written policy—situations in which a municipality has knowingly acquiesced in an unconstitutional result of what its express policies have left unsaid." *Id.* Under this theory, a plaintiff "must typically point to evidence of a prior pattern of similar constitutional violations" to "ensure that there is a true municipal policy at issue, not a random event." *Id.*

Although Mr. Dempsey alleges that QCC violated his Fourteenth Amendment rights, municipal liability attaches only when the plaintiff shows that the municipality acted with deliberate indifference. *See J.K.J. v. Polk Cnty.*, 960 F.3d 367, 377 (7th Cir. 2020); *Miranda v. Cnty. of Lake*, 900 F.3d 335, 345 (7th Cir. 2018) (applying deliberate indifference standard to pretrial detainee's *Monell* claim). Under that standard, Mr. Dempsey "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *J.K.J.*, 960 F.3d at 377.

Here, Mr. Dempsey has not designated any evidence showing that QCC had a policy, pattern, or practice of denying adequate medical care for allergies. Instead, he mostly argues that NP Reynolds and other medical providers failed to follow the existing policies by not sending him to the emergency room or changing his diet, leading to a breakdown in communication. *See* dkt. 65 at 6–7. Mr. Dempsey, however, has not designated evidence that reasonable medical

care required those interventions or that they were required under QCC policy in his situation. *See id.* That evidence is integral to a *Monell* claim since QCC cannot be held liable under a theory of *respondeat superior*. *See Simpson v. Brown Cnty.*, 860 F.3d 1001, 1005-6 (7th Cir. 2017) ("[M]unicipal governments cannot be held liable for damages under 42 U.S.C. § 1983 on a theory of *respondeat superior* for constitutional violations committed by their employees.").

Moreover, Mr. Dempsey was consistently under medical care and treated with Benadryl, topical creams, and anti-inflammatory medications such as Methotrexate. *See* dkt. 58-1 at 2–22, 65–72. Mr. Dempsey claims that the Benadryl and creams did not work, but his medical records show that his rash symptoms subsided with the treatment. *See, e.g., id.* at 72. Mr. Dempsey takes issue with the fact that Methotrexate is prescribed for cancer, but does not explain how this prescription injured him or demonstrates unreasonableness. *See* dkt. 65 at 6. Nor has he designated evidence of any event when he was in anaphylactic shock requiring transport to an emergency room. *See id.*; *Miranda*, 900 F.3d at 344 (affirming summary judgment on *Monell* claim because the jail "had a system in place, and that system included a serious of reasonable measures").

QCC is therefore entitled to summary judgment.

## IV.
## Conclusion

The Defendants' motion for summary judgment, dkt. [57], is **GRANTED.**

Final judgment shall issue by separate entry.

**SO ORDERED.**

Date: 9/15/2026

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

SEAN DEMPSEY
2609 Park Street
Terre Haute, IN 47803

Brian M. Pierce
Brian M. Pierce, Attorney at Law
brian@brianpiercelaw.com